**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SWITCH, LTD., <br><br> Plaintiff, <br><br> v. <br><br> ALIGNED DATA CENTERS LLC and MTECHNOLOGY INC., <br><br> Defendants. | CIVIL ACTION NO. 2:17-CV-574-JRG <br><br> **JURY TRIAL DEMANDED** |
| ALIGNED DATA CENTERS, LLC, ALIGNED DATA CENTERS (DFW), LLC, and ALIGNED DATA CENTERS (PHOENIX), LLC, <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> SWITCH, LTD., <br><br> Counterclaim-Defendant. | |

**DEFENDANT ALIGNED DATA CENTERS, LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF SWITCH, LTD'S FIRST AMENDED COMPLAINT
FOR PATENT INFRINGEMENT**

I.       **<u>INTRODUCTION</u>**

Switch's response to Aligned's Motion to Dismiss does not rebut the central premise of Aligned's Motion: even viewing the First Amended Complaint ("FAC") in the light most favorable to Switch and granting Switch the broadest interpretation of the asserted claim, Switch has included evidence and allegations in its FAC that affirmatively demonstrate that Aligned's data centers cannot meet at least one limitation of claim 10 of the '389 patent.

Switch does not contest that black letter patent law ultimately dooms its claim. And, this is the second time that Switch has pleaded claims that are doomed: Switch dropped all of the claims in its original Complaint following Aligned's first Motion to Dismiss. In this second try, Switch plays for time, arguing that it is "inappropriate" at this phase of the litigation for the Court to consider the documents and theories that <u>Switch</u> included in the FAC. Switch argues that "fact finding" is necessary before the Court can determine if the FAC is *legally* flawed and urges the Court to permit Switch to drag these proceedings out before making any legal determination.

Switch's argument misses the point. Additional fact finding is unnecessary for the Court to consider Aligned's Motion because the Motion relies on nothing outside of the evidence and allegations that Switch submitted with the FAC, along with the plain language of the claim at issue and the '389 patent itself. The entire point of the Supreme Court's *Twombly* and *Iqbal* canon is that the parties and the Court do not need to postpone the determination of the legal viability of a claim past the pleadings stage. It was Switch's burden to plead a plausible claim that would permit it to burden the parties and the Court with discovery and further proceedings. In its two attempts, Switch has not done so. Aligned requests that the Court dismiss Switch's FAC with prejudice.

## II. ARGUMENT

### A. Switch Has Pleaded An Implausible Claim

A complaint cannot survive a motion to dismiss unless it presents a plausible claim on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is not plausible unless it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). In the context of patent infringement, "there can be no infringement as a matter of law if a claim limitation is totally missing from the accused device." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991). Thus, the court cannot "draw the reasonable inference that the defendant is liable" for patent infringement when the complaint itself affirmatively establishes that at least one claim limitation is missing from the alleged infringing instrumentality. Such a complaint does not state a plausible claim for relief and is properly dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Iqbal*, 556 U.S. at 678.

Switch has pleaded such an implausible claim. As discussed in Aligned's opening Motion, Switch has alleged that various portions of the eSync units in Aligned's data centers simultaneously meet claim 10's "cool air ductwork" and "opening into the airspace" limitations. (*See* D.I. 61 at 7–12; *see also* D.I. 57 ¶¶ 53, 58.) More specifically, Switch makes the following three allegations about the eSync units:

(1) The eSync units are located "on top of the thermal barrier ceiling" (D.I. 57 ¶ 59);

(2) "The cool air ductwork is comprised of the portion of the eSync unit used to transfer cooled air from the coil(s) [inside the eSync unit] to outside the eSync unit" (*id.* ¶ 58); and

(3) The openings into the eSync units from the hot air containment chamber constitute an "opening into the airspace" because the eSync units "are located within the airspace between the ceiling and the thermal barrier ceiling" (*see id.* ¶ 53).

However, as also discussed in the opening Motion, the plain language of the '389 patent mandates that the structures that satisfy the "cool air ductwork" and "opening into the airspace" limitations be located in mutually exclusive physical locations. (*See* D.I. 61 at 10–12.) The claimed "cool air ductwork" must be located <u>below</u> the thermal barrier ceiling, while the claimed "opening into the airspace" must allow access to the warm air plenum <u>above</u> the thermal barrier ceiling. (*See id.* at 7–12.) Switch's own allegations of ***how*** the eSync units meet the "opening into the airspace" limitation require the eSync units to be located <u>above</u> the thermal barrier ceiling, even though Switch simultaneously argues that the eSync units are the "cool air ductwork" that is required to be <u>below</u> the thermal barrier ceiling. (*See id.* at 10–12.) Thus, if Switch insists that the eSync units meet one of these limitations, it admits that the eSync units cannot meet the other limitation. Switch offers no explanation how the eSync units can simultaneously be both below and above the thermal barrier ceiling.

Instead, Switch rewrites the claim language. According to Switch, claim 10 only requires the "support brackets to support the ductwork below the thermal barrier ceiling, not that the ductwork *be* below the thermal barrier ceiling." (D.I. 64 at 5 (emphasis in original).) But, no claim construction could support Switch's wholesale redrafting of the claim.

As Aligned noted in its Motion, claim 10 clearly and plainly states that the "second plurality of vertical support brackets each further support portions of the cool air ductwork below the thermal barrier ceiling." ('389 patent, claim 10, col. 11:3–6.) On its face, with no further interpretation, this plain language requires not only vertical support brackets that support

portions of the cool air ductwork, but also that the support brackets and the portions of the cool air ductwork be located below the thermal barrier ceiling.

Though Switch argues that the Court is required to afford claim 10 its "broadest possible construction" at this stage of the proceedings (D.I. 64 at 4), that does not give Switch a license to rewrite claim language to better fit its infringement theories. *Cf. Kubik v. Intrexon Corp.*, 2012 WL 13024808, at *1 (W.D. Wash. Apr. 30, 2012) ("[T]he Court is required only to draw reasonable inferences from [the complaint], not whatever inferences Plaintiff chooses."). No plausible reading of claim 10 permits the cool air ductwork to be located above the thermal barrier ceiling. No claim construction is required to reach this conclusion.

At bottom, Switch alleges that a component of the eSync units meets claim 10's "cool air ductwork" and "opening into the airspace" limitations and that the eSync units are located wholly above the thermal barrier ceiling. (D.I. 57 ¶ 53, 58–59.) But because claim 10—on its face—requires that the "cool air ductwork" be located below the thermal barrier ceiling, the eSync units cannot meet both of the limitations for which Switch proffers them. Accordingly, the FAC affirmatively demonstrates at least one limitation is missing from Switch's claim; thus, the FAC does not state a plausible claim for relief.[1]

### B. The Court Can Properly Construe Claim 10 Based On The Current Record

The crux of Switch's argument is that the Court should not consider Aligned's Motion because it allegedly relies on claim construction arguments. According to Switch, claim construction is inappropriate at the pleading stage and any attempt to interpret a patent claim must be postponed until later in the proceedings. (*See* D.I. 64 at 1, 4–7 (citing *In re Bill of*

---

[1] Switch also mischaracterizes Aligned's argument regarding claim 10 as an "attempt to prove non-infringement on [the] pleadings . . . ." (*See* D.I. 64 at 5.) Aligned need not and does not attempt to prove anything at this stage other than Switch has failed to state a plausible claim for infringement.

*Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1343 (Fed. Cir. 2012)).) Courts have rejected such arguments.

For example, in *Scripps Research Institute v. Illumina, Inc.*, Illumina moved to dismiss Scripps' claim for patent infringement on the grounds that Scripps' complaint rested on an implausible interpretation of a specific term in the patent claim at issue and that, under a proper interpretation of that term, Scripps failed to plausibly plead infringement. 2017 WL 1361623, at *3 (S.D. Cal. Apr. 14, 2017). Scripps countered that Illumina's motion was premature because it was "based entirely on a claim construction argument" and urged the court to postpone consideration of Illumina's argument until after claim construction occurred. *Id.* at *4.

The court disagreed with Scripps. Though the court noted that claim construction at the pleading stage is inappropriate when "the meaning of a claim term is unclear from the intrinsic evidence," a court "may properly construe a claim term at the pleading stage" when the construction is "based on the claim language, the specification, and the prosecution history"— *i.e.*, when it is a purely *legal* determination. *Id.*; *see also Atlas IP, LLC v. Exelon Corp.*, 189 F. Supp. 3d 768, 774 (N.D. Ill. 2016) ("[Plaintiff] is therefore entirely incorrect in stating that claim construction cannot be engaged in at all at the motion to dismiss stage, at least when it is based on facts alleged in or reasonably inferable from the complaint."). "Because such constructions would be 'legal determinations,' these constructions could be case dispositive at the outset, determining whether a plaintiff can legally state a claim for relief before the parties engage in expensive and ultimately unnecessary discovery." *Scripps*, 2017 WL 1361623, at *4 (citation omitted); *see also id.* ("The purpose of a 12(b)(6) motion is, after all, to determine whether a

plaintiff states a legally cognizable claim for relief."). Thus, Switch is incorrect in its assertion that claim construction is never appropriate at the pleading stage.[2]

As discussed above, no claim construction is required for the Court to determine that Switch's FAC is legally deficient. *See supra* Part II.A. Yet, even if it were, it is entirely appropriate for the Court to look to the allegations in the FAC and the language of the patent itself to determine whether Switch has plausibly alleged infringement of claim 10. *Scripps*, 2017 WL 1361623, at *4; *Atlas IP*, 189 F. Supp. 3d at 774.

With respect to the "cool air ductwork" limitation, the '389 patent specification confirms that the plain language of claim 10 requires the cool air ductwork to be located below the thermal barrier ceiling. For example, the '389 patent repeatedly instructs to completely segregate the hot air in the ceiling plenum above the thermal barrier ceiling <u>from the cool air</u> by an "air tight seal" and that "the only openings to the ceiling air" are through the openings at the top of the hot air containment chambers—which are themselves completely sealed off from the cool air areas. (*See id.* col. 4:38–49, col. 6:33–42, col. 6:55–67.) Figure 4B clearly illustrates this configuration:

---

[2] Switch's theory is also impossible to square with the Supreme Court's *Twombly* and *Iqbal* canon. As discussed above, a patent infringement claim requires the plaintiff to plausibly allege that that every limitation of the asserted claim is present in the allegedly infringing instrumentality. However, a court cannot make this determination on a motion to dismiss without at least reading the asserted patent and making basic interpretations of the language therein for purposes of comparing it to the allegations in the complaint. If courts were not permitted to do so on the grounds that such determinations constituted claim construction, patent infringement claims would be exempt from the *Twombly* / *Iqbal* plausibility requirements that have governed such claims since the abrogation of Rule 84 and from Rule 12(b)(6) in general.



FIG. 4B

The thermal barrier ceiling 1740 is above the cold air supply ducts 1710, which are supported from below by support pillars 1708 and 1708A. (*See id.* at col. 7:23-37, col. 8:31-38.) "A claim construction that excludes a preferred embodiment . . . is rarely, if ever, correct." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).

    Switch offers no plausible explanation how claim 10 permits the cool air ductwork to be located anywhere but below the thermal barrier ceiling if the only openings through the thermal barrier ceiling are located directly above the sealed hot air containment chambers while the remainder of the thermal barrier ceiling forms an "air tight seal" preventing the flow of air from above the thermal barrier ceiling to below. If the cool air ductwork was located <u>above</u> the thermal barrier ceiling, it would not be able to deliver cold air to the equipment located <u>beneath</u>

the thermal barrier ceiling because the thermal barrier ceiling is "air tight." ('389 patent, col. 6:33–42.) Accordingly, Switch's argument that claim 10 does not require the cool air ductwork to be located below the thermal barrier ceiling is wholly contradicted by the patent.[3]

Simply put, all of the intrinsic evidence confirms that the "cool air ductwork" must be located below the thermal barrier ceiling. Switch has alleged that the eSync units, which purportedly contain the element that satisfies the "cool air ductwork" limitation, are located above the thermal barrier ceiling. This affirmatively demonstrates that at least one limitation of claim 10 is missing from Aligned's data centers and, thus, the FAC does not plausibly state a claim for infringement of claim 10.

### C. Switch's Remaining Arguments Lack Merit

Short on legal positions, Switch resorts to red herring arguments regarding the propriety of its litigation tactics and *ad hominem* attacks against Aligned. (*See generally* D.I. 64 at 1, 7–9.) Aspersions aside, Switch's arguments lack merit and the Court can disregard them.

*First*, Switch presents itself as an innocent party that received a "threatening letter" out of the blue from Aligned's litigation counsel on July 31, 2017. (*See* D.I. 64 at 7–9 (citing D.I. 57-4).) Incorrect. Switch was the party that initiated the instant conflict by sending its July 21, 2017 letter to Aligned that all but accused Aligned of patent infringement. (*See* D.I. 57-2.) Switch also neglects to inform the Court that on July 27, 2017—four days before Aligned

---

[3] Switch also alleges that the eSync units "are located within the airspace between the ceiling and the thermal barrier ceiling, ***and they further output cooled air into the airspace.***" (D.I. 57 ¶ 54 (emphasis added).) However, as discussed above, the thermal barrier ceiling creates an "air tight seal" between the airspace above the thermal barrier ceiling and the air space below the thermal barrier ceiling. ('389 patent, col. 6:33–42.) Switch offers no plausible explanation how the cool air that the eSync units purportedly output into the airspace between the ceiling and the thermal barrier ceiling would be able to reach and cool the equipment below since the "air tight" thermal barrier ceiling would prevent it from doing so. Thus, if the Court accepts Switch's allegations regarding the function of the eSync units, Aligned's data centers must also be missing claim 10's required "thermal barrier ceiling" and the FAC still fails.

responded to Switch's initial letter—Switch sent a *second* letter to Aligned to inform Aligned that Switch was planning on pursuing legal action against Aligned and advising Aligned to begin preserving records for discovery. (*See* D.I. 57-3.) Switch's actions contradict its contention that it was left with "no choice but litigation" after receiving Aligned's July 31, 2017 letter.

*Second*, Switch characterizes the October 27, 2017 inspection of Aligned's Plano facilities as a boon for Aligned that resulted in a narrowing of the allegations in this action. (*See* D.I. 64 at 8.) Subsequent developments in this litigation since the inspection, however, have validated Aligned's original concerns regarding the purpose of that inspection and Switch's litigation tactics in general. After the inspection, Switch dismissed its original claims against Aligned and asserted claim 10 of the '389 patent, which is now the only claim at issue. Switch avers that its decision was a result of the inspection, which "resolved [the] conflicts" in the publicly available information on which Switch based both of its complaints. (*See id.*) Yet, Switch represented—both to Aligned and to this Court—that the information it sought from the inspection was for use in bringing a preliminary injunction motion, not to shore up, test, or amend its infringement theories. (*See* D.I. 25 at 1–5.) That Aligned is facing fewer patent infringement allegations as a result of Switch's inspection does not change or excuse that Switch used the judicial process to gain access to Aligned's facility, and then used the information it gleaned from that inspection to attempt to plead a claim for infringement. It also does not change Aligned's position that Switch failed to perform a proper pre-filing investigation of Aligned's alleged infringement. Nor does it solve the deficiency in Switch's new claim.

*Third*, despite Switch's statements to the contrary, Aligned has not "abandoned" any of its prior positions regarding other limitations of claim 10 that it does not meet. Instead, Aligned

9

has focused only on the most absurd position Switch has asserted—*i.e.*, that something can physically be above something while simultaneously being below it.[4]

*Fourth*, Switch repeatedly contends that Aligned copied Switch's data center designs. (*See* D.I. 64 at 2–4.) But if that were so, then surely Switch would be able to make out more than an implausible assertion that Aligned infringes a single claim of a single Switch patent.

*Finally*, Switch expresses bewilderment that Aligned chose to move to dismiss the FAC rather than simply answering. (*See id.* at 1 ("Surely, Switch believed, Aligned would not move to dismiss a narrowly tailored complaint that included detailed limitation-by-limitation explanations of its infringement theories.").) But it should come as no surprise that Switch's implausible pleading would draw a motion to dismiss for failure to state a claim. *See Scripps*, 2017 WL 1361623, at *4; *see also* Fed. R. Civ. P. 12(a)(4)(A) (defendant not required to answer complaint unless and until the Court rules on a pre-answer motion under Rule 12(b)). Switch's derision does not render Aligned's Motion "baseless" or "pointless," and does not reflect that Aligned has a "cavalier attitude toward law and facts." (*See* D.I. 64 at 1, 7, 9.) Switch's indecorous accusations aside, Aligned's motion is straightforward and Switch's irreconcilable pleading should be dismissed.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Aligned respectfully requests the Court to grant its Motion and dismiss the FAC with prejudice.

---

[4] Among many other required claim limitations that Aligned does not practice include: (1) a sealed hot air chamber (Aligned does not have sealed chambers in its open structure); (2) a hot air containment structure that is supported from the floor (Aligned hangs its structures from the ceiling); (3) vertical support brackets holding a portion of a thermal shield such that telecommunications wiring and power wiring are disposed within a plurality of ladder racks and a plurality of conduits adjacent to the thermal shield (Aligned hangs cable trays and ladder racks from the ceiling grid); and (4) a thermal shield and barrier (Aligned's containment hood has no thermal properties because Aligned employs airflow management techniques to guide air to its microchannel coils for heat rejection rather than hot air containment to exhaust hot air outside).

DATED: February 15, 2018 Respectfully submitted,

*/s/ Michael A. Berta*
Michael E. Jones
SBN: 10929400
**POTTER MINTON, PC**
110 North College, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-531-3939
mikejones@potterminton.com

Michael A. Berta
Michael.berta@apks.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Tel: 415-471-3277

David A. Caine
David.caine@apks.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Tel: 650-319-4710

Nicholas H. Lee
Nicholas.lee@apks.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Tel: 213-243-4156

*ATTORNEYS FOR ALIGNED DATA CENTERS LLC, ALIGNED DATA CENTERS (DFW), LLC, AND ALIGNED DATA CENTERS (PHOENIX), LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 15, 2018.

>*/s/ Michael A. Berta*
>Michael A. Berta
>Michael.berta@apks.com
>**ARNOLD & PORTER KAYE SCHOLER LLP**
>Three Embarcadero Center
>10th Floor
>San Francisco, CA 94111-4024
>Tel:   415-471-3277